If it be a rule of law, dictated by the laws of humanity, that a confession extorted by hope or fear cannot be given in evidence, the cases of *Page 87 
Rex v. Butcher, and State v. Moore, must furnish exceptions to that rule, in favor of the State. In almost every case the exception will destroy the rule. Few cases, indeed, occur without facts to which part of the confession will apply.
Facts speak for themselves, and may be given in evidence there is no doubt; and to break in upon the rule, for the purpose of taking such parts of the confession as relate to facts, seems to arise only in the too anxious solicitude to convict.
The case of Rex v. Butcher was determined in the year 1798.
Many of the English decisions, since the Revolution, approach too near severity to be consistent with the humane principles in the ancient books.
The law appears to be more correctly laid down, in the case of the King v. Warrackhall, 1 M'N. 47, and recognized in Dorothy Mozey's case, 1 M'N. 43.
That wherever the acts done are not sufficient to make out a charge, conversation or confession extorted by fear or hope cannot be received, so as to couple it with those acts, in order to make out the proof.
WHITE, J., said he had not fully considered of this case, but was inclined to think that the law was as stated in the opinion delivered.
John Sheflet, a witness for the State, deposed to many of the facts stated by Mr. Miller. He believed the deceased to have been murdered, heard a number of persons examine the defendant, but she constantly denied knowing any thing about the death of her father.
There appeared to be a difference in her countenance when her father was found. She appeared to be scared; had been acquainted with the family about three years, and lived a near neighbor. He never saw her at work nor ever abroad.
She appeared to be of an obstinate disposition.
He stayed all night at the house after the body was found. She did not discover any disposition to make her escape, though she might have done so.
The deceased was at his house, and was telling *Page 88 
him that this girl and two of his other children had run away, and then stated the ages of his children; but did not recollect them.
The prisoner was tied early in the morning, and remained so until the inquest.
WHITE, J., stated to the jury the circumstances that were necessary to constitute murder. Their inquiry was, whether the prisoner was the person who took the life of the deceased, and, if they were of that opinion, to inquire whether it were done with malice aforethought.
From the circumstances appearing, there seemed to be no doubt as to malice, except what had been attempted on the ground of the tender years of the prisoner. Neither argument nor authority had been introduced on this point. He stated what he conceived to be the law on this point, and, if incorrect, should be glad to be corrected from any quarter.
If a person of fourteen years of age does an act, such as stated in this indictment, the presumption of law is that the person is dolicapax. If under fourteen and not less than seven, the presumption of law is that the person cannot discern between right and wrong. But this presumption is removed, if from the circumstances it appears that the person discovered a consciousness of wrong. The jury retired, and, after being absent a few hours, returned a verdict not guilty.
ORIGINAL NOTE. — During this trial the prisoner did not discover any symptoms of mind, of alarm, or the least understanding of what was passing. Her eyes were nearly closed, nor was she observed to wink. The sheriff took her out of the bar, and in doing this, she appeared so perfectly insensible as to strike her head against the end of it.
She stood for some time motionless in the court yard, where great numbers of persons examined her from curiosity.
At length it was understood that some charitable women, who lived in the neighborhood, led her away from the crowd.
The next day, just before the sitting of the Court, two of the judges were walking in a balcony opposite *Page 89 
the court house, when one of them observed there was a girl sitting near an old woman at the steps of the court house, who in shape and size very much resembled the girl tried the day before.
After a few minutes she threw up her head, and instantly appeared a countenance which was recognized to be the same.
Her eyes were open, clear, animated, and emitted striking sensations of complaisancy.
In stature she was low, but of a robust, square form. Her cheek-bones high, and her face broad. Instead of her pale deathlike countenance exhibited in court, her complexion was vivid, and her countenance expressive. As the judges passed by her in going into court she threw up her head and smiled.
These circumstances are mentioned for the purpose of showing the inconceivable effort, and exertion of which the human mind is capable, under certain circumstances. How she became impressed with the danger in which she was placed, remains to be discovered, for so she must have been to have fitted her mind for the more than human task it had to perform.
After having been arraigned for murdering her father, it would not be strange if every nerve were tremulously alarmed.
But how any being endued with thinking powers could so abstract the mind, and withdraw its accustomed emanations from the countenance, upon so awful an emergency, is beyond ordinary calculation.
She certainly practised a deception, and that most completely. No person was seen but supposed she had literally lost her understanding, if not her speech. Several hundreds, if not thousands, particularly examined her from time to time, and none discovered the deception. This part of her character, to some, may appear the more extraordinary, when it is recollected that she was young, without education, decorum a sense of religion, or the benefit of social intercourse.
But it seems, that these circumstances alone enabled her to perform an effort of dissimulation too much for ordinary belief. *Page 90 
To have maintained this abstraction of mind, and to have kept every sensation of the soul from appearing on the countenance, upon so trying an occasion, and for such a length of time, seems to require powers beyond those attached to the human character.
Her education was a disgrace to those whose duty it was to attend to it. Without schooling, precept, example, morals, or the light derived from social intercourse, we behold an extraordinary character. Though the fraud she practised required determination of mind and command of countenance of which the human character before was thought incapable, there exists a much greater cause for regret than for admiration.
This is a striking proof of the benefits of education to children. Let it be a warning to those who have the care of education. Parents cannot be too awfully impressed with the responsibility attached to them. Crimes of children are too often owing to the want of good precepts, education, and morals. At the day of retribution, these things must be taken into account with an all just God.
A similar attempt to impose upon the Court appeared at the Old Baily in May, 1787. 3 Lawyer's Magazine, 133. The grand jury found a bill of indictment against Elizabeth Steel, for simple grand larceny. On her arraignment, she stood mute. The Court directed a jury instanter, and they were sworn to inquire whether she stood mute of malice, or by the visitation of God. The jury returned a verdict, mute by the visitation of God. The prisoner was remanded, and the question referred to the consideration of the judges, whether, under these circumstances, she could be tried upon the indictment.
In Trinity term following, the judges assembled at Serjeants' Inn Hall, and they were of opinion that a verdict finding a prisoner mute by the visitation of God, was not an absolute bar to her being tried upon the indictment, for, although a person, surdus et mutus anativitate, in contemplation of law, may be incapable of guilt upon presumption of idiotism, yet that presumption may be repelled by evidence of his capacity to understand by signs and tokens, *Page 91 
which it is known that persons thus affected frequently possess to a very great extent. Great diligence and circumspection ought however to be exercised in so critical a case.
But if all means to convey intelligence to the mind of such a person respecting the nature of an arraignment should prove ineffectual, the clerk of the arraigns may enter the plea of not guilty; and then it is incumbent on the Court to inquire touching all those points of which the prisoner might take advantage himself, to examine all the proceedings against him, with a critical eye, and to render him every service consistent with the rules of law.
In the October session following the prisoner was again put upon her arraignment. On being asked by the clerk of the arraigns whether she was guilty or not guilty, she replied, "You know I cannot hear." The Court upon a supposition that she could hear, repeatedly explained to her the nature and effect of the opinion of the judges. That it was in vain for her to attempt to evade her arraignment by pretended deafness, for that as she must at all events be charged with the felony for which she was indicted, she would lose by such practice, the advantage of asking proper questions of the witnesses, but all endeavors proving ineffectual, a jury was again returned and sworn well and truly to inquire whether Elizabeth Steel, the prisoner at the bar, stands mute through wilfulness and obstinacy, or through the visitation of God, and the jury again found a verdict mute by the visitation of God. The same jury were immediately sworn in chief, and charged to try the indictment. They found the prisoner guilty,
and at the close of the session she received sentence of transportation for seven years.